UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
G5 TECHNOLOGIES, INC.,                    :
                                         :     04 Civ. 1201 (DLC)
                     Plaintiff,          :
                                         :     <u>OPINION AND ORDER</u>
          -v-                            :
                                         :
INTERNATIONAL BUSINESS MACHINES           :
CORPORATION,                             :
                                         :
                     Defendant.          :
                                         :
----------------------------------------X

Appearances:

For the Plaintiff:

Mario Aieta
Daniel Jacobson
Robert Carrillo
Garvey Schubert Barer
599 Broadway, Eighth Floor
New York, New York  10012

For the Defendant:

Steven M. Edwards
Morris Waisbrot
William F. Haigney
Hogan & Hartson L.L.P.
875 Third Avenue
New York, New York  10022


DENISE COTE, District Judge:

     In this contractual dispute, plaintiff G5 Technologies, Inc.

("G5") alleges that defendant International Business Machines

Corporation ("IBM") used jointly-developed software partly based

on G5's trade secret and confidential information in commercial

software applications without properly compensating G5.  This

dispute arises from a project on which these parties cooperated

but which never proceeded past its initial phases.  G5's
contribution to the project included providing a team of experts,
while IBM committed its resources to the development of software
that IBM contends it then could freely use.  Following discovery,
IBM has moved for summary judgment, relying on what it contends
are unambiguous terms in the interlocking agreements executed by
the parties.  For the following reasons, IBM's motion is granted.

**BACKGROUND**

The documents that are critical to the resolution of this
dispute and which are quoted at length below, include a customer
agreement that treated all shared information as nonconfidential
unless protected by a confidentiality agreement; a
confidentiality agreement that allowed IBM to use G5's
confidential information for the purpose for which it was
disclosed; and "statements of work" that gave IBM title to all of
the documents detailing the processes on which G5 is suing, and
permitted IBM to "freely use" any idea provided by G5.  Taken
together, these and the other documents described here
unambiguously refute G5's claim that IBM used G5's confidential
information for an impermissible purpose.  The following facts
are undisputed, or viewed in the light most favorable to the
plaintiff, unless otherwise noted.

The Parties

G5 is a Delaware corporation with its principal place of

business in New Jersey.  G5 began in May 1999 as G5, LLC, becoming G5 Technologies, Inc. in February 2000.  William M. Adams ("Adams") formed G5 with others and has served as G5's President and CEO since its inception.  G5 was created as a spin off of AgileWeb, Inc. ("AgileWeb").  Adams was also President and CEO of AgileWeb from February 1996 to the summer of 2000.  In November 2000, G5 acquired all of the stock of AgileWeb.  At all relevant times, AgileWeb had no employees and its work was performed by G5 or other subcontractors.  Through Adams, both AgileWeb and G5 were involved in the development of processes for the forming and operating of virtual companies.  A virtual company, also called an "agile virtual enterprise," is a corporation comprised of a group of companies that have been selected from an array of candidate companies in order to work together to satisfy a temporary market need.  G5 claims ownership in a system for forming and operating virtual companies called the Virtual Corporation Management System ("VCMS").

IBM is a New York corporation with offices in this District. IBM needs no introduction.  It is a famous, global company that provides computer hardware, software, and consulting services to individual consumers, businesses, and governments.  IBM worked with G5 from 1999 to 2001 on a software development project funded in part by the Commonwealth of Pennsylvania ("Pennsylvania") involving VCMS.  The information that G5 shared with IBM in late 1999 during the Pennsylvania Project is the source of this dispute.

<u>The Pennsylvania Project</u>

During 1999, G5 and AgileWeb made proposals to Pennsylvania's Department of Community and Economic Development ("DCED") aimed at obtaining funding to develop and commercialize VCMS. G5 and AgileWeb also engaged private companies such as IBM in discussions about developing and commercializing VCMS. In a letter dated September 17, 1999, DCED committed to provide up to $2.7 million in funding for the development of VCMS "on which AgileWeb has been working cooperatively with IBM and others." The letter stated that DCED and AgileWeb must enter into a definitive written agreement prior to funding, and provided for an allocation of the funds as follows: up to $2.1 million for "development of the VCMS architecture by IBM" on the condition that, among other things, direct private investment totaling $4 million would be made by sources to be identified by AgileWeb, in consideration for DCED receiving, among other things, "assignable licensees [sic] for 15 operable beta tests with industry groups or sectors"; and up to $600,000 "to support AgileWeb's development of the beta groups" that would participate in the VCMS testing.

In a February 7, 2000 letter to DCED, Adams reported that the total cost for developing the VCMS software would be $5.9 million. Based on this calculation, IBM anticipated contributing approximately $4 million of its own funds in addition to the funding it anticipated receiving from Pennsylvania to develop the software. IBM's collaboration with G5 and AgileWeb was governed

by five written agreements described in greater detail below: an August 1999 Confidentiality Agreement, a September 1999 Interim Negotiation Letter, a September 1999 IBM Customer Agreement, a November 1999 Statement of Work, and a May 2000 Statement of Work. Despite their initial work together, G5 and IBM did not conclude any final agreement about the development of a VCMS system.

Confidentiality Agreement

On August 14, 1999, Adams executed for G5 IBM's standard confidentiality agreement labeled the "IBM Agreement for Exchange of Confidential Information" ("Confidentiality Agreement"). IBM executed the Confidentiality Agreement on August 17. Under this agreement, if a party wished shared information to be protected, it had to execute a Supplement to the Confidentiality Agreement. The Confidentiality Agreement provided that "[e]ach time one of the parties wishes to disclose specific information to the other, the Discloser will issue a Supplement to this Agreement (Supplement) before disclosure." The recipient of confidential information agrees to use that information "for the purpose for which it was disclosed or otherwise for the benefit of the Discloser." (Emphasis supplied.) The Confidentiality Agreement also contains a merger clause providing that "[t]his Agreement and its Supplements are the complete and exclusive agreement regarding our disclosures of information and replace any prior oral or written communications between us." As described below,

G5 contends that confidential information that it first shared with IBM on December 8, 1999 was covered by a Supplement to the Confidentiality Agreement dated December 13, 1999.

Interim Negotiation Letter

On September 29, 1999, Adams executed for G5 a letter of intent labeled an "Interim Negotiation Letter" ("INL").  IBM executed the INL on October 13.  The INL "confirm[ed] [the] companies' understanding with respect to our preliminary discussions concerning the Virtual Corporation Management System (VCMS) project and how our companies may engage in business opportunities in the future."  The INL expresses the subject matter covered by the letter as follows:

> Both of us intend to play key roles in a VCMS
> Consortium (VCMSC) within the Commonwealth of
> Pennsylvania.  Both of us maintain that we may be able
> to contribute to VCMSC participating companies and/or
> specified customers professional services, e-business
> infrastructure, and unique preexisting technologies.
> Prior to negotiating any definitive written agreements
> regarding how those services, infrastructure and
> technology should be marketed and sold, we agree that
> we need to evaluate the nature of each companies [sic]
> contribution to a potential VCMS solution.
>
> As part of our evaluation, IBM will provide G5 with
> certain information regarding IBM's e-business
> framework technologies and solutions as well as any
> other information IBM and G5 consider to be relevant to
> the evaluation of IBM's potential contribution to the
> VCMS solution.  G5 will provide IBM with information
> related to G5's potential contribution to the VCMS
> solution as well as any other information IBM and G5
> consider to be relevant.

(Emphasis supplied.)

The INL states that "[i]nformation disclosed during the

6

course of our companies' discussions will not be considered

confidential, despite any statements or legends to the contrary,

unless it is or has been disclosed under the terms of the

[Confidentiality Agreement] signed by both companies, effective

August 17, 1999, and which is incorporated herein by reference."

The INL goes on to state:

> Although our companies may exchange proposals (written
> or oral), term sheets, draft agreements or other
> materials, <u>neither company will have any obligations or
> liability</u> to the other unless and <u>until our companies'
> authorized representatives sign definitive written
> agreements</u>. Exchanged terms are non-binding to the
> extent they are not included in definitive agreements.
> Either company can end these discussions at any time,
> for any reason, and without liability to the other.
> Each company remains free to negotiate or enter into
> similar relationships with others.

(Emphasis supplied.) The INL also provides that

> neither company will rely on the successful conclusion
> of a business relationship. Any business decision
> either company makes in anticipation of definitive
> agreements is at the sole risk of the party making the
> decision, even if the other party is aware of, or has
> indicated approval of, such decision.

Finally, the INL contains a merger clause stating that it is

> our complete and exclusive understanding on the subject
> and supersedes any prior oral or written discussions
> regarding the subject matter. This letter can only be
> modified by a writing signed by each party that states
> it amends this letter.

IBM Customer Agreement

Also on September 29, Adams executed for AgileWeb an IBM

Customer Agreement ("Customer Agreement"). IBM executed this

Agreement on October 13. The Customer Agreement is the master

agreement that a customer signs when it begins doing business

with IBM, as it sets forth the general terms and conditions under which IBM will provide products or services to a customer. The Customer Agreement states that "all information exchanged is nonconfidential. If either of us requires the exchange of confidential information, it will be made under a signed confidentiality agreement."

The Customer Agreement provides for the ownership of materials generated during the collaboration between IBM and AgileWeb, establishing two categories of materials: Type I Materials and Type II Materials. It is a sub-category of Type II Materials that is the subject of this dispute.

The Customer Agreement defines Type I Materials as those created "during the Service performance period" in which AgileWeb retains "all right, title, and interest (including ownership of copyright)." The Agreement states that AgileWeb grants IBM "1) an irrevocable, nonexclusive, worldwide, paid-up license to use, execute, reproduce, display, perform, distribute (internally and externally) copies of, and prepare derivative works based on Type I Materials and 2) the right to authorize others to do any of the former."

The Customer Agreement defines Type II Materials as those created "during the Service performance period or otherwise (such as those that preexist the Service)" in which IBM or third parties retain "all right, title, and interest (including ownership of copyright)." The Agreement states that IBM grants AgileWeb "1) an irrevocable, nonexclusive, worldwide, paid-up

8

license to use, execute, reproduce, display, perform, and distribute, within [AgileWeb's] Enterprise only, copies of Type II Materials."  Under the Agreement, "<u>Any idea, concept, know-how, or technique which</u> relates to the subject matter of a Service and <u>is developed or provided by either of us</u>, or jointly by both of us, in the performance of a Service <u>may</u> (subject to applicable patents and copyrights) <u>be freely used by either of us</u>."  (Emphasis supplied.)

The Customer Agreement also states that "[f]or each business transaction, we will provide you with the appropriate 'Transaction Documents' that confirm the specific details of the transaction."  The Agreement notes that such Transaction Documents "will be signed by both of us if requested by either of us," and include "statements of work," which cover the "scope of Services, responsibilities, deliverables, completion criteria, estimated schedule or contract period, and charges."  The parties later executed two statements of work.  Finally, the Customer Agreement states that "[i]f there is a conflict among the terms in the various documents, those of an Attachment prevail over those of this Agreement," and "[t]he terms of a Transaction Document prevail over those of both of these documents."

<u>Statement of Work 1</u>

On November 12, 1999, Adams executed for AgileWeb a statement of work dated October 10 and labeled "IBM Proposal for Consulting Services" ("Statement of Work 1").  On May 3, 2000, at

the request of IBM, Adams executed for AgileWeb a statement of work also dated May 3 and labeled "IBM Proposal for Services" ("Statement of Work 2").  Both Statements of Work state that "IBM will perform the effort described in this Statement of Work under the terms and conditions of the IBM Customer Agreement."  The Statements of Work also provide that the "complete agreement between us about these services consists of 1) this Statement of Work, [and] 2) the IBM Customer Agreement," and that "[t]here are no other agreements or terms which affect this Statement of Work or the services related thereto."  By their terms, the Statements of Work "can only be modified when both [parties] agree in writing."  Both Statements of Work provide that AgileWeb's responsibilities will be provided "at no charge to IBM."  As explained below, G5 contends that IBM must compensate G5 for any commercial use it makes of software that IBM developed under Statement of Work 2 because G5 conveyed confidential information to IBM pursuant to Statement of Work 1.

Statement of Work 1 lays out five phases of work that will be required to create the VCMS system.  Statement of Work 1 covers only the work required to complete the initial phase of the project, "Phase 0," which involved "VCMS e-business process definition and architecture design."  The Statement indicates that "[f]uture phases' levels of effort will be negotiated and mutually agreed to in writing prior to each phase," that "[b]oth parties agree that this Project may not be successfully completed," and that "[a]ny changes to [AgileWeb's] operations in

expectation of a successfully completed Project . . . must be based solely on [AgileWeb's] business judgment." Statement of Work 1 states that "IBM will conduct Phase 0 for an estimated 1310 hours of consulting at the IBM Industrial Sector Management Consulting 1999 hourly rates," and that "[t]he estimated funding requirement for Phase 0 is $396,000." Under this Statement of Work, "IBM acknowledges that AWI may not pay such invoices until it receives funding from PA DCED."

Statement of Work 1 describes the responsibilities of IBM and AgileWeb for Phase 0. It assigns certain "Project Management" responsibilities to IBM, and states that IBM "will use the IBM DesignFlow™ methodology to define the AS IS business processes used by AWI and to develop the critical TO BE VCMS e-business processes," and will "create an e-business infrastructure architecture to web-enable the VCMS B2B commerce model." It also assigns certain "Project Manager" responsibilities to AgileWeb, and states that AgileWeb's Phase 0 responsibilities are, among other things, to

- Provide a core team made up of subject matter experts knowledgeable about the candidate processes
- Coordinate the participation of the AWI BAC, CBN, GBS and AVE subject matter experts to actively participate in workshops, as agreed between IBM and AWI, to define the AS IS processes, issues and root causes and to identify design requirements for the TO BE e-business processes
- . . . .
- Provide access to requirements, schedules, process definitions, resource structure and other "shelf data" as needed during the project

Adams testified that the "core team" was to consist of himself and a number of other G5 employees, and that the majority

of the "processes" that were to be provided were G5 processes.[1]
G5 admits that it provided a team of subject matter experts and
participated in workshops with IBM in order to fulfill AgileWeb's
obligations under Statement of Work 1.  G5 contends, however,
that it disclosed information only pursuant to the terms of the
Confidentiality Agreement.

Statement of Work 1 describes three documents as Type II
Materials as defined in the ICA: (1) "DesignFlow™ 'Volume 1'
document for the AS IS process," (2) "DesignFlow™ 'Volume 2'
document for the TO BE e-business process design requirements,"
and (3) "VCMS e-business infrastructure architecture report."
Statement of Work 1 was later amended to categorize a fourth item
as Type II Material, namely, IBM's documentation of the automated
VCMS process being designed by IBM, described in the amendment as
"DesignFlow™ 'Volume 3' document for the TO BE process."  The
amendment was signed by IBM as well as Adams on behalf of
AgileWeb on February 28, 2000.  Adams and G5 understood that, to
interpret the property rights of the parties to materials
identified as Type I or Type II in the Statements of Work, it
would be necessary to refer back to the ICA.


Statement of Work 2

Statement of Work 2 covers the work required to complete the
second phase of the project, "Phase 1," which involved "VCMS beta

_____

[1]  G5 contends that AgileWeb did not provide G5's processes
to IBM, but that G5 provided them to IBM only pursuant to the
Confidentiality Agreement.

development," including basic requirements and capabilities matching, vendor identification and notification, basic collaboration support, corporate registration, and coalition formation. Statement of Work 2 states that "IBM will conduct Phase 1 for an estimated 5,000 hours (estimated) [sic] at the hourly rate of $300/hour," and that "[t]he estimated funding requirement for Phase 1 fees is $1,500,000." Under this Statement of Work, "IBM acknowledges that AWI may not pay such invoices until it receives funding from PA DCED."

Statement of Work 2 describes the responsibilities of IBM and AgileWeb for Phase 1. It assigns certain "Project Management" responsibilities to IBM, as well as six categories of responsibilities consisting of the development of five software products ("VCMS Beta Test Software") and a hosting system to allow pilot users to test the products.[2] The VCMS Beta Test

---

[2] Statement of Work 2 describes the following five products. Release 1 is "Basic Requirements and Capabilities Matching," which means that "[t]he IBM team will work with the domain experts identified by AWI to develop a structured question and answer process with the objective of developing a match between the customer requirements and the vendor capabilities." Release 2 is "Vendor Identification and Notification," which means that "[t]he IBM team will develop a mechanism that takes the results of the matchmaking and support a single-stage RFQ negotiation," which includes "notifying the potential responders of an invitation to respond to the RFQ, developing the response, viewing the responses, and selecting/awarding the response." Release 3 is "Basic Collaboration Support," which means that "[t]he IBM team will add a collaboration database to the prior releases to allow the initiation of a[n] electronic 'bidder's conference' to occur after the vendor selection process is complete." Release 4 is "Corporate Registration," which means that "[t]he IBM team will develop and demonstrate a corporate registration process utilizing business certificates." Release 5 is "Coalition Formation," which means that "[t]he IBM team will add coalition formation support to the preceding releases."

Software was designed to demonstrate the feasibility of a portion of the VCMS processes, but was not a finished product. G5 does not allege that the Software was ever turned into or sold as a product. Statement of Work 2 also assigns certain "Project Manager" responsibilities to AgileWeb, and states that AgileWeb's Phase 1 responsibilities are, among other things, to

- Provide a core team made up of subject matter and domain experts knowledgeable about the semiconductor test equipment automation processes and marketplace
- Coordinate the participation of the subject matter and domain experts to actively participate in workshops, as agreed between IBM and AWI, to provide input, and feedback on each release
- Coordinate the participation of the semiconductor test equipment automation firms and target VCMS application sites to validate and test the various releases
- Provide access to requirements, schedules, process definitions, resource structure and other "shelf data" as needed during the project[.]

Statement of Work 2 also states that "AWI will ensure involvement of AWI personnel who will serve as executive sponsor, Project Manager, and process owner. AWI will also ensure the involvement of core team members, including representatives of the Commonwealth of Pennsylvania, Metro Automation and The Jade Corporation."

Statement of Work 2 creates a new category of materials

---

Statement of Work 2 also describes the parameters of the hosting services that IBM would provide. It states among other things that "IBM will provide hosting services for the later releases of the VCMS infrastructure software," that the services "will be accessible for the pilot users to test and allow them to provide feedback for the development team," and that they "will be made available on a limited basis and support will be through the VCMS development team."

generated during the collaboration called "Type IIA Materials."
It is these materials that are the subject of this dispute. Type
IIA Materials are those materials "created during the project,
which [IBM] will own (including ownership of copyright). No
license is granted to [AgileWeb] with respect to Type IIA
Materials." Statement of Work 2 goes on to provide that "both
parties are free to use any ideas, concepts, know-how, or
techniques, which are developed or provided by the other or
jointly by both parties during a project," and that "both parties
are free to enter into similar agreements with others and to
develop and provide Materials or Services that are similar to
those provide [sic] under this Agreement." (Emphasis supplied.)

Statement of Work 2 identifies seven Type IIA Materials:

- VCMS infrastructure demonstration and test
  environment (accessible via URL supplied by the VCMS
  development team)
- VCMS Question and Answer Process
- VCMS vendor notification process with user dialog
  for accept/decline input
- VCMS discussion database and simple document
  repository
- VCMS corporate registration process
- VCMS coalition formulation process
- VCMS infrastructure development releases for testing
  and evaluation

Statement of Work 2 indicates that "IBM will grant remote access
to the Type IIA Materials and AWI will not receive copies of any
such Type IIA Materials." Statement of Work 2 identifies one
Type I Material, "Periodic Status Report as required by the AWI
Project Manager," and no Type II Material.

Disclosure and Use of G5's Intellectual Property

        According to Adams, G5 had a subcontract with AgileWeb in
1999, pursuant to which G5 provided AgileWeb access to G5's
intellectual property in 1999 and 2000 in return for money that
had been allocated by Pennsylvania to AgileWeb.[3]  Adams admitted
that G5 provided its intellectual property, know-how, and
manpower to fulfill AgileWeb's contracts with IBM.

        G5 alleges that its VCMS trade secret was provided to IBM in
a December 8, 1999 e-mail from Adams to Jeff Soo Hoo of IBM that
included as an attachment a description of a sixteen-step VCMS
process.  In the e-mail, Adams wrote: "Jeff, I need to have you
incorporate this into the NDA supplement and sign it to keep us
both clean."  Adams testified that this meant that the
information, which was sent in preparation for a VCMS workshop
that would be held on December 13-15, 1999, would be disclosed
pursuant to a supplement to the Confidentiality Agreement.  On
December 13, 1999, Adams and Soo Hoo executed a Supplement for
Disclosure ("Confidentiality Supplement") pursuant to the
Confidentiality Agreement that describes three pieces of
confidential information disclosed by G5 to IBM:

        1) VCMS Business Model e-mail from Bill Adams to Jeff
        Soo Hoo, describing "as is" and "to be" elements of the
        VCMS processes.
        2) The VCMS collaborative database located at
        www.g5technologies.com (catagory [sic] G5 confid
        documents).
        3) Decembe [sic] 13-15, 1999 VCMS Workshop Notes[.]

_____

        [3]  G5 has not supplied a copy of the subcontract with its
motion papers.

The Confidentiality Supplement states that "[b]oth of us agree that this Supplement and the IBM Agreement for the Exchange of Confidential Information are the complete and exclusive agreement regarding this disclosure and replace any prior oral or written communications between us."  G5 alleges that additional details about its trade secret were disclosed to IBM at the December 13-15, 1999 workshop, and that a document entitled "Virtual Corporation Management System To-Be Workshop Notes," which is described as the third item in the Confidentiality Supplement, was also misused by IBM.

IBM developed "Simba" or VCMS infrastructure software pursuant to Statement of Work 2, which identified the software processes contained in the VCMS infrastructure software as Type IIA Materials.  Adams testified that IBM was not free to use any portion of the software developed under Statement of Work 2 without compensating G5, because IBM had developed that software in order to satisfy the VCMS process "requirements" that G5 gave IBM, and those "requirements" were G5's intellectual property. Adams testified that IBM would have to compensate G5 for commercially reusing any portion of the VCMS software, even if the commercially reused portion involved a technique that IBM had developed based upon its own expertise and without using any of the information that G5 had provided, because G5 paid IBM to develop software that would execute G5's VCMS processes.  Adams testified that this was "the agreement" between G5 and IBM, although he conceded that this was "not in a written contract."

17

According to Adams, IBM made this agreement over an eighteen month period from 1999 through 2001 by "consistently behaving" as though such an agreement had been in place.

G5's Claims

The essence of G5's claim is that G5 disclosed to IBM G5's VCMS trade secret pursuant to a confidentiality agreement, and that IBM later introduced commercially available software based on VCMS without compensating G5. G5 alleges that IBM incorporated G5's trade secret into eight IBM software products: WebSphere Business Connection, WebSphere Business Integrator, WebSphere Business Integration Connect, Lotus Quick Place, Lotus Same Time, WebSphere Business Commerce Edition 5.1, WebSphere Integration Solution Manager, and WebSphere Commerce Suite.

The Complaint contains five causes of action. First, G5 claims that IBM used G5's confidential information in breach of the Confidentiality Agreement. Second, G5 claims that IBM stole trade secrets in breach of an implied confidential relationship with G5. Third, G5 claims that IBM stole trade secrets in breach of the Confidentiality Agreement. Fourth, G5 claims that IBM breached a contract "implied in fact" to compensate G5 for IBM's commercialization of VCMS. Fifth, G5 claims that IBM owes G5 a quasi-contractual duty to compensate G5 for the value of the services G5 provided under a theory of quantum meruit.

Procedural History

G5 filed the Complaint on February 13, 2004. Following the entry of a pretrial scheduling order on June 25, 2004, and subsequent discovery, the parties agreed in a consent order dated February 17, 2005 that the issues raised in this motion were ripe for early summary judgment. This motion followed.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R. Civ. P.; accord Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

<u>Breach of Contract Claims</u>

It is undisputed that the contracts at issue in this matter are governed by New York law.  Under New York law, in order to prevail on a breach of contract claim, a plaintiff must show: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." <u>Terwilliger v. Terwilliger</u>, 206 F.3d 240, 246 (2d Cir. 2000) (citation omitted). "In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms."  <u>South Road Assocs., LLC v. Int'l Bus. Machines Corp.</u>, 4 N.Y.3d 272, 277 (2005) (citation omitted).  This principle is particularly important "where commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length."  <u>Id.</u> (citation omitted).  <u>See also</u> <u>Anthracite Capital, Inc. v. MP-555 West Fifth Mezzanine, LLC</u>, No. 03 Civ. 5219 (DLC), 2005 WL 1155418, at *6 (S.D.N.Y. May 17, 2005).  A contract is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no basis for a difference of opinion."  <u>Photopaint Techs., LLC v. Smartlens Corp.</u>, 335 F.3d 152, 160 (2d Cir. 2003) (citation omitted). Where contract language is unambiguous, the intent of the parties must be gleaned from the agreement.  <u>Poznik v. Froebel</u>, 766 N.Y.S.2d 877, 878 (2d Dep't 2003).  <u>See also</u> <u>County of Suffolk v.</u>

Alcorn, 266 F.3d 131, 138 (2d Cir. 2001).  Unambiguous contract

terms "are given their plain meaning."  Krumme v. West Point

Stevens, 238 F.3d 133, 139 (2d Cir. 2000) (citation omitted).  On

the other hand, contract language is ambiguous if it is "capable

of more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire

integrated agreement."  Id. (citation omitted).  See also British

Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d

Cir. 2003).

Where, as here, a motion for summary judgment concerns the

interpretation of a contract, "summary judgment may be granted

when [the contract's] words convey a definite and precise meaning

absent any ambiguity."  Aetna Cas. & Sur. Co. v. Aniero Concrete

Co., 404 F.3d 566, 598 (2d Cir. 2005) (citation omitted).  See

also Adirondack Transit Lines, Inc. v. United Transp. Union, 305

F.3d 82, 85 (2d Cir. 2002).  On the other hand, "[w]here the

language used is susceptible to differing interpretations, each

of which may be said to be as reasonable as another, and where

there is relevant extrinsic evidence of the parties' actual

intent, the meaning of the words become[s] an issue of fact and

summary judgment is inappropriate."  Aetna, 404 F.3d at 598

(citation omitted).  Ambiguity in contractual language does not

exist, however, merely because "the parties urge different

interpretations" or where "one party's view strains the contract

language beyond its reasonable and ordinary meaning."  Id.

(citation omitted).

Claims One and Three of the Complaint rest on the allegation that IBM breached the Confidentiality Agreement. The Confidentiality Agreement between G5 and IBM provides that the recipient of confidential information will use that information "for the purpose for which it was disclosed," and that anytime a disclosing party desires the Confidentiality Agreement to cover the disclosed information, "the Discloser will issue a Supplement to this Agreement (Supplement) before disclosure." It is undisputed that the Confidentiality Agreement covers the details of G5's VCMS processes, because they were disclosed pursuant to the Confidentiality Supplement.[4]

Because G5's breach of contract claims are based on G5's allegation that IBM did not use G5's confidential trade secret for the purpose for which it was disclosed, the Confidentiality Agreement -- concluded months before the December 1999 disclosure -- cannot shed light on the purpose of the disclosure. G5, however, acknowledges that it disclosed the VCMS processes to IBM in order to fulfill AgileWeb's obligations to IBM under Statement of Work 1 and the Customer Agreement that it incorporated by reference. Thus, it is necessary to examine the agreements pursuant to which G5 disclosed its VCMS processes to determine whether there is a genuine issue of material fact regarding the

_____

[4] Although G5 disclosed the VCMS processes to IBM first, and only requested that they be covered by a supplement after disclosure, IBM signed the Confidentiality Supplement and has never claimed that the timing of the Supplement should affect whether the VCMS processes are covered by the Confidentiality Agreement.

permissible uses of the VCMS processes.

Statement of Work 1 required AgileWeb to provide IBM with "access to requirements [and] process definitions . . . as needed during the project," that AgileWeb would do this, among other things, "at no charge to IBM,"[5] that future phases of the project remained to be negotiated, and that "[t]here are no other agreements or terms which affect this Statement of Work or the services related thereto." Statement of Work 1, by defining the documents detailing the VCMS processes as Type II Materials, gave IBM "all right, title, and interest" in those documents pursuant to the Customer Agreement. The Customer Agreement, which is incorporated by reference in the Statements of Work, states that "[a]ny idea, concept, know-how, or technique which relates to the subject matter of a Service and is developed or provided by either of us . . . in the performance of a Service <u>may</u> (subject to applicable patents and copyrights) be <u>freely used by either of us</u>." (Emphasis supplied.)

The contractual language recited above conclusively demonstrates that the parties agreed that IBM did not have to compensate G5 for its VCMS disclosure even if IBM later incorporated VCMS into other IBM software products, and that at the very least, if G5 sought compensation for IBM's subsequent inclusion of VCMS in IBM's software, G5 would need to conclude an

---

[5]  G5 does not contend that there was no consideration involved in Statement of Work 1, and acknowledges that IBM contributed millions of dollars of its own resources to make up for the shortfall in funding for the Pennsylvania project.

23

agreement to that effect with IBM.  The purpose of G5's

disclosure was to fulfill AgileWeb's obligations to IBM under

Statement of Work 1 and the Customer Agreement, and under those

contracts, IBM was permitted to use VCMS processes in its own

software if it chose to do so.

IBM's permissible uses of the VCMS processes are further

confirmed in Statement of Work 2.[6]  Following the disclosure,

Adams, acting for AgileWeb, agreed with IBM in Statement of Work

2 that IBM would own VCMS processes and software, that "both

parties are free to enter into similar agreements with others and

to develop and provide Materials or Services" similar to those

being developed by AgileWeb and IBM, and that IBM would be "<u>free

to use</u> any ideas, concepts, know-how, or techniques . . .

provided by" AgileWeb.  (Emphasis supplied.)[7]

G5 objects that using evidence outside the four corners of

---

[6]  To the extent that G5 argues that Statement of Work 2 was
not a binding contract because IBM never signed it, and therefore
cannot supply a permissible IBM "use" of the VCMS processes, this
argument fails for at least two reasons.  First, IBM did sign
Statement of Work 2.  Second, even if IBM had not signed
Statement of Work 2, the Statement of Work was an IBM proposal
that stated that both parties had to sign only if one of the
parties requested that both sign.  G5 only points to IBM's
request that AgileWeb sign Statement of Work 2, and does not
allege that IBM or AgileWeb requested that both parties sign the
contract.

[7]  Although it is not essential to the resolution of this
motion, a previous agreement confirms that the parties understood
that they had made no contractual arrangement regarding how to
market and sell software using VCMS processes.  G5 acknowledged
in an agreement with IBM that "G5 will provide IBM with
information related to G5's potential contribution to the VCMS
solution" and that this would be done "[p]rior to negotiating any
definitive written agreements regarding how [VCMS] services,
infrastructure and technology should be marketed and sold."

the Confidentiality Agreement in order to determine the "purpose" of the VCMS disclosure is tantamount to a concession that the Confidentiality Agreement is ambiguous, and that summary judgment is therefore inappropriate. This objection is misplaced. There is nothing ambiguous about an agreement to use information "for the purpose for which it was disclosed." Indeed, G5 admitted that the purpose of its disclosure was to fulfill AgileWeb's contractual obligations to IBM under Statement of Work 1 and the Customer Agreement.[8] The relevant issue is whether the Statements of Work and the Customer Agreement are unambiguous in permitting IBM's "use" of the VCMS processes to include the uses alleged by G5 in its Complaint.[9] For the reasons stated above, they are.

G5 also objects that the Confidentiality Supplement is superfluous if IBM's view of the permissible uses of the VCMS

---

[8] As a result of this admission, G5's observation that it did not sign the Customer Agreement or Statements of Work is beside the point.

[9] On this point, G5's citation of <u>Bamira v. Greenberg</u>, 682 N.Y.S.2d 174 (1st Dep't 1998), is inapposite. In <u>Bamira</u>, the plaintiff, who had agreed to form a corporation with the defendant, accused the defendant of misappropriating an opportunity to purchase shares in a different corporation. Although the defendant claimed that his agreement with the plaintiff was strictly limited to creating a marketing company, and did not include purchasing shares in a different corporation, their agreement stated that their proposed corporation would have "other purposes" in addition to marketing. <u>Id.</u> at 175. This was sufficient for the court to determine that the contract was ambiguous with respect to the purposes of the proposed corporation. <u>Id.</u> Here, however, there is no dispute about the meaning of the word "purpose." G5 admits that it disclosed its VCMS processes for the purpose of fulfilling AgileWeb's obligations under Statement of Work 1 and the Customer Agreement.

processes is adopted, because if IBM was permitted to "freely use" the processes, it would have been unnecessary or meaningless to disclose them under a supplement pursuant to the Confidentiality Agreement.  Holding that IBM was permitted to use the VCMS processes in its own software, however, does not mean that the "freely use" language effectively gave it limitless discretion that would eviscerate the Confidentiality Agreement and its Supplements.  For example, although G5 does not allege that IBM disclosed VCMS processes to third parties in violation of the Confidentiality Agreement, it would be plausible, in the context of the existing agreements, to argue that "using" VCMS processes would not include disclosing those processes to third parties.  Moreover, if the project had proceeded and the exchange of ideas become more detailed and concrete, it is entirely possible that the parties would have written a narrower Statement of Work that restricted the use of information covered by a Confidentiality Agreement.

For this reason, G5 also misses the mark where it argues that the "freely use" language of the Customer Agreement "[o]bviously . . . was intended to apply to 'nonconfidential' information only" because a different section of the Customer Agreement states that "all information exchanged is nonconfidential" and that "if either of us requires the exchange of confidential information, it will be made under a signed confidentiality agreement."  Because the "freely use" language is not necessarily inconsistent with confidential disclosures, G5's

proposed interpretation is not required, and, indeed, is at odds with the plain text of the Customer Agreement that states that "[a]ny idea . . . provided by either of us . . . may . . . be freely used by either of us."  (Emphasis supplied.)

Finally, G5 objects that the Customer Agreement and Statement of Work 1 do not provide a discernible "purpose" other than to state that "[t]he goal of this project is to develop an e-business infrastructure and technology demonstration intended to web-enable key business to business e-commerce processes required to operate a VCMS community based business model."  G5 therefore contends that it only disclosed the VCMS processes in order to facilitate the creation of a technology demonstration, not to permit IBM to use the VCMS processes in IBM's own software.  So long as G5 conveyed the information for a "purpose" outlined in a Statement of Work, however, the Statement of Work explicitly gave IBM the right to freely use the information.  If the use of the information was to be limited to the development and support of the Pennsylvania Project, then the parties were required to say so.  Instead, they chose to provide that, at this initial stage of the project, any idea they exchanged could be "freely" used by the other.  For these reasons, summary judgment for IBM is granted on G5's breach of contract claims, Claims One and Three in the Complaint.


Implied Contract Claim

It is well-settled that "[a] contract cannot be implied in

27

fact where there is an express contract covering the subject matter involved." Julien J. Studley, Inc. v. New York News, Inc., 512 N.E.2d 300, 301 (N.Y. 1987) (citation omitted). See also Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 376 n.5 (2d Cir. 2000) ("[E]xpress contract and implied-in-fact contract theories are mutually exclusive.") (applying New York law).[10]

G5's fourth claim in the Complaint is based on an implied contract theory:

> In consideration for the disclosure, the assistance, and the funding provided to IBM by G5, IBM agreed to compensate G5 for the commercialization of G5's VCMS. IBM has commercialized G5's VCMS as embodied in IBM's Websphere Business Integration Connect products and related services. In breach of the contract implied in fact between G5 and IBM, IBM has failed and refuses to compensate G5 for the commercialization of G5's VCMS.

As described above, the Customer Agreement and Statements of Work are express contracts covering the subject matter of G5's alleged implied contract.

G5 contends that Statement of Work 1 does not cover the subject matter of the alleged implied contract because it only addresses IBM's ownership of documents describing the VCMS processes, not the processes themselves. G5 fails to address other portions of Statement of Work 1 and the Customer Agreement, however, that expressly provide that AgileWeb would supply the

---

[10] G5's citation of Prudential Oil Corp. V. Phillips Petroleum Co., 418 F. Supp. 258, 260 (S.D.N.Y.), rev'd on other grounds by 546 F.2d 469 (2d Cir. 1976), is inapposite because there was no express contract covering the same subject matter as the alleged implied contract.

VCMS processes to IBM "at no charge to IBM," that future phases
of the project remained to be negotiated, that "[t]here are no
other agreements or terms which affect this Statement of Work or
the services related thereto," and that IBM could "freely use"
G5's disclosures.[11]   These express agreements foreclose G5's
implied contract claim because G5 supplied the VCMS processes to
fulfill AgileWeb's contractual obligations, and those contracts
provided that the processes would be supplied at no charge to
IBM.

        In any event, even if the Customer Agreement and Statements
of Work did not cover the subject matter of G5's alleged implied
contract, in the INL G5 explicitly acknowledged that a written
contract would be required to generate the sort of liability it
now claims based on an implied contract: "Although our companies
may exchange proposals (written or oral), . . . neither company
will have any obligations or liability to the other unless and
until our companies' authorized representatives sign definitive
written agreements."   Indeed, G5's decision to continue to
collaborate with IBM on the VCMS project and to provide IBM with
access to G5's confidential information before reaching an

_____

        [11]   G5's argument that the Confidentiality Agreement
supersedes the Customer Agreement and Statements of Work because
the Confidentiality Agreement states that "[o]nly a written
agreement signed by both of us may modify this agreement" is
misplaced.   IBM's claim is not that the Customer Agreement or
Statements of Work constitute written "modifications" of the
Confidentiality Agreement, but rather that they supply the
permissible uses of G5's disclosure.   As noted above, the
Confidentiality Agreement, Customer Agreement, and Statements of
Work are not in conflict.

agreement on profit-sharing in relation to any commercial
software applications using G5's information is precisely the
type of "business decision" made "in anticipation of definitive
agreements" that the INL explicitly states is "at the sole risk
of the party making the decision, even if the other party is
aware of, or has indicated approval of, such decision."  As this
constituted the parties' "complete and exclusive understanding on
the subject" that superseded any prior communications between the
parties on the subject and could "only be modified by a writing
signed by each party that states it amends the letter," there is
no room for G5 to argue that it retained implied contractual
rights against IBM for its VCMS disclosure.[12]  For these reasons,

_____

[12]    Although G5 objects that the INL does not cover the
same subject matter, the INL's plain language refers
unequivocally to G5's contribution to the VCMS project for
Pennsylvania, and clearly refers to the commercialization of VCMS
where it states that the parties had not yet agreed on how their
"unique preexisting technologies" for VCMSC participating
companies should be "marketed and sold."  When this passage is
combined with the later INL text precluding unwritten agreements,
G5's implied contract theory is untenable.
        G5's resort to parol evidence in this area is superfluous
where, as here, contractual language is unambiguous.  G5 could
not avoid summary judgment in favor of IBM on this claim,
however, even based on the August 17, 1999 e-mail from an IBM
employee to Adams that G5 relies on to advance its implied
contract claim, because that e-mail does not reflect any
agreement:
        I would like to re-state the official message to G5 in
        the following manner.  "IBM and G5 would like to engage
        in a contractual obligation as soon as possible to
        further develop the scope and nature of the
        relationship between both companies.  It is likely that
        G5 and IBM may be able to work out some revenue & risk
        sharing (28/72%) arrangement to compensate for their
        intellectual property reuse in VCMS and successful
        launch at first few customers.  It is likely that all
        the T's and C's will be worked out between both
        companies within 90 days from signing the letter of

30

summary judgment is granted to IBM on G5's fourth claim for breach of an implied contract.

Quantum Meruit Claim

"Under New York law, the existence of an express contract governing a particular subject matter ordinarily precludes recovery in quantum meruit for events arising out of the same subject matter." Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 262-63 (2d Cir. 1999). See also Cooper, Bamundo, Hecht & Longworth, LLP v. Kuczinski, 789 N.Y.S.2d 508, 510 (2d Dep't 2005); Finkelstein v. Kins, 511 N.Y.S.2d 285, 291 (1st Dep't 1987). Moreover, where a plaintiff has already been compensated under an agreement for the provision of services, that plaintiff can only prevail on a quantum meruit theory if it can show that "the allegedly uncompensated duties (performed) were distinct in character from those duties for which plaintiff was compensated." LaJaunie v. DaGrossa, 552 N.Y.S.2d 628, 629 (1st Dep't 1990).

G5 acknowledges that AgileWeb compensated it for providing its intellectual property to satisfy AgileWeb's contractual

intent with IBM.  At this point, IBM is open for discussion to define G5's relationship with as [sic] one of many possible ones including but not limited to a business partner or a channel.  It is IBM's intent to appoint G5 as the key stake holder of VCMS outside their role as a[n] active member of VCMS consortium. Revenue flows, financial obligations, definition of various business models and further definition of actual relationship needs [sic] to be developed once the letter of intent is signed early next week.  Both companies are working in good faith until such an agreement is reached".

obligations to IBM, and it cannot now seek additional compensation from IBM for the same service under a quantum meruit theory.  For this reason, in addition to the same reasons that allowed IBM to prevail on G5's implied contract claim, summary judgment is granted to IBM on G5's fifth claim for quantum meruit.


<u>Theft of Trade Secret by Breach of Confidence Claim</u>

G5's second claim in the Complaint is an implied breach of confidence claim, whereby G5 alleges that IBM "knew or had reason to know that the disclosures made to it by G5 were intended to be in confidence" and that IBM breached that confidence by using G5's trade secrets "for its own benefit and to the detriment of G5."  Because VCMS was disclosed pursuant to an express confidentiality agreement, G5 may not pursue a claim based on breach of an implied confidentiality agreement for the reasons explained above pursuant to G5's implied contract claims.  <u>See also</u> <u>Ferroline Corp. v. Gen. Aniline & Film Corp.</u>, 207 F.2d 912, 922 (7th Cir. 1953) ("Although a confidential relationship may be implied in a proper case, where there is an express agreement between the parties covering the subject matter, the law will not create another by inference." (citation omitted)).

G5 also argues for the first time[13] in its opposition to IBM's summary judgment motion that G5 may have disclosed

---

[13]  G5 did not raise this claim in its interrogatory responses or during depositions.

confidential information to IBM <u>prior</u> to the Confidentiality
Agreement, pursuant to a nondisclosure agreement that IBM and G5
signed in March 1999. Even so, the Confidentiality Agreement
states that "[t]his Agreement and the Supplements are the
complete and exclusive agreement regarding our disclosures of
information, and replace any prior oral or written communications
between us." Consequently, any previous confidentiality
obligations were replaced with the creation of the
Confidentiality Agreement, such that any prior disclosures that
G5 wished to remain confidential would require a supplement to
the Confidentiality Agreement. Moreover, even on this motion, G5
points to no specific disclosures prior to the Confidentiality
Agreement that it contends were intended to be confidential.
Consequently, summary judgment is granted to IBM on G5's second
claim for theft of trade secret by breach of confidence.

## CONCLUSION

IBM's summary judgment motion is granted. The Clerk of
Court shall enter judgment in favor of IBM and close the case.

SO ORDERED:

Dated:     New York, New York
           September 19, 2005

_____
DENISE COTE
United States District Judge

33